IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 11, 2014 Session

**ERIK E. GUERRERO v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Maury County**
**No. 17883     Robert L. Holloway, Judge**

_____

**No. M2013-01181-CCA-R3-PC - Filed April 2, 2014**

_____

A Maury County jury convicted the Petitioner, Erik E. Guerrero, of two counts of first degree premeditated murder, two counts of first degree felony murder, and nine counts of attempted first degree murder, and the trial court sentenced the Petitioner to an effective sentence of life in the Tennessee Department of Correction. This Court affirmed the judgments and sentence on appeal. *State v. Erik E. Guerrero*, No. M2010-00851-CCA-R3-CD, 2011 WL 3107722, at *1 (Tenn. Crim. App., at Nashville, Dec. 21, 2010), *perm. app. denied* (Tenn. Nov. 17, 2011). The Petitioner timely filed a petition for post-conviction relief, which the post-conviction court dismissed after a hearing. On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because he received the ineffective assistance of counsel at trial because his trial counsel failed to: (1) request a jury instruction on the natural and probable consequences rule; (2) adequately advise him of all of the considerations of not testifying in his own defense; and (3) to challenge the admissibility of his statements. After a thorough review of the record and applicable authorities, we conclude that the post-conviction court did not err when it dismissed the petition. The post-conviction court's judgment is, therefore, affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH and JEFFREY S. BIVINS, JJ., joined.

Jacob J. Hubbell, Columbia, Tennessee, for the Appellant, Erik E. Guerrero.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; and Mike Bottoms, District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

## I. Facts
### A. Trial

This case arises from a shooting that occurred while two vehicles traveled down a highway on April 13, 2008, in Maury County, Tennessee. This Court summarized the facts presented at the Petitioner's trial on charges stemming from these events as follows:

The police investigation in this case revealed that after a fight broke out during a party at the National Guard Armory, police intervened and dispersed the crowd. Two vehicles, a gold Pontiac Grand Am and a Ford Expedition, both containing persons who had attended the party at the Armory, were traveling down Nashville Highway when passengers in the Pontiac Grand Am fired at the Ford Expedition, shooting four passengers, two of whom died as a result. The [Petitioner] was a passenger in the left rear seat of the Pontiac Grand Am at the time of this incident.

A Maury County grand jury indicted the [Petitioner] for two counts of first degree premeditated murder, two counts of first degree felony murder, nine counts of aggravated assault, and nine counts of attempted first degree murder. At the [Petitioner]'s trial on these charges, the following evidence was presented: Sarah Garcia, who was nineteen at the time of trial, testified that in April 2008 she was in a relationship with and living with Jose Castro, the owner of the Ford Expedition. Around 10:00 p.m. on the night of April 12, 2008, Garcia traveled to a birthday party at the National Guard Armory in Columbia, Tennessee, in Castro's Expedition accompanied by Castro, Patricia Garcia, who was her sister; Jason and Juan Castro, both younger brothers of Jose Castro; and Dalila Cortinas, Jose Castro's cousin. They remained at the party until midnight when a fight broke out and police arrived and escorted people out of the building. When Sarah Garcia and Jose Castro left the Armory, several additional people accompanied them in the Expedition. Sarah recalled Jose was in the driver's seat and she rode in the front passenger seat. Four people were in the second row of seating, including Patricia Garcia, and three people were in the third row of seating. There were two more people were in the back of the Expedition.

Sarah Garcia testified that, as they drove home, she was talking with the other passengers in the Expedition when Jose called their attention to a car approaching with its lights off, which he thought might be a police officer. He warned the passengers who were riding in the back of the Expedition to remain still because they were not all wearing seatbelts. Sarah recalled that she turned

2

as the car was passing them and saw a light, which she later realized was gunfire, in the front passenger seat of the vehicle. She said that the gunshots "didn't stop" and Jose threw her onto his lap and told the passengers to "get down." Garcia said, "I just remember thinking when is this going to stop? Because they just kept going." Garcia testified that she was shot in her left leg but did not realize it until they were driving to the hospital after the shooting. Garcia recalled that she heard Juan Castro, Jose's younger brother, say that he had been shot and Jason Castro, Jose's nine-year old brother, yell to Jose, "Hurry up, [Juan] is not breathing." Sarah said that Jose drove the SUV to the hospital, and that during the drive she tried to talk to her sister, Patricia, but Patricia did not respond.

At the hospital, Sarah learned that she had a femur fracture, shattered bone, and a broken artery and vein that required three surgeries within the week of the shooting. She was confined to a wheelchair for a month, and thereafter required a walker for two months. For the following three to four months, she walked on crutches. Garcia testified that, prior to the night of the shooting, she had never seen or heard of the [Petitioner] or his co-defendants.

Garcia testified that her sister, Patricia Garcia, twenty-four years old and the mother of three at the time of the shooting, died as a result of the gunshot wounds.

Jose Castro confirmed that on April 12, 2008, he attended a birthday party at the National Guard Armory. Jose recalled that it was a large party and that, later in the evening, a fight broke out, which resulted in police escorting people from the building. Jose said that he was not involved in the fight and did not know the [Petitioner] or his co-defendants. After the fight, Jose got into his orange 1997 Expedition along with ten other people, none of whom were wearing a Titans jersey. Jose was driving down Nashville Highway when he noticed a car behind him that, for approximately a mile, repeatedly pulled up close to his car and then slowed down. Initially, the lights on the car were on, but when Jose stopped at a stop light he noticed they were turned off. Jose recalled the car coming alongside his Expedition after which he heard gunshots. In response, Jose rammed his Expedition into the car to run it off the road to stop the shooting. After running the car off the road, Jose drove to Williamson Medical Center. Jose said that his younger brother, Juan Castro, was covered with blood and shaking when they arrived at the hospital, and that he later died due to his injuries. Juan said that he sustained a gunshot wound in the thigh, which prevented him from walking for three to four months. Juan

3

testified that his vehicle contained no weapons at the time of this shooting.

Carlos Landauro testified that he attended the party with Jose Castro, and he confirmed that a fight, in which he was not involved, occurred before the group left in Jose's Expedition. Landauro, seated behind the driver's seat next to Patricia Garcia, heard gunfire and then saw Patricia fall forward. Landauro, who was not injured in the shooting, did not know the [Petitioner] or any of his co-defendants.

Jason Castro, eleven at the time of trial, testified that he went to a party with his family. Jason confirmed he had two brothers Juan, who was sixteen when this shooting occurred, and Jose. A disturbance occurred during the party and Jason heard "beer bottles and chairs crashing on the floor." Police soon arrived, and Jason left the building and got into the very back of Jose's Expedition. As they were driving home, Jason heard Jose tell everyone to "duck," and then he saw "just like sparks all over the truck." He heard Juan say that he had been shot, and he saw Juan lying down and bleeding. Jason, who was not injured during this incident, recalled that Juan could not speak, and he was "breathing hard."

During cross-examination, Jason agreed that in his statement to police after the fight at the Armory he said that his brothers had hit someone and were, therefore, forced to leave because they had been in a fight.

Jeremy Humphrey, a Columbia Police Department officer, testified that early on the morning of April 13, 2008, he responded to a report of a disturbance at the National Guard Armory. Being one of the last units to respond, however, he found the situation already resolved when he arrived. Humphrey left the National Guard Armory and was en route to a police substation when he heard a police report of a shooting "in the 1700 block of Nashville Highway," which was close to where he was driving. Officer Humphrey responded, and upon arriving he immediately noticed that the road "sparkled" from broken glass and that a "really bright orange tennis shoe" lay on the roadway. A truck, a wrecked gold Pontiac Grand Am, and another small sedan were at the scene. Officer Humphrey saw a [H]ispanic male, he later identified as Robert Guerrero, and a white male talking. In order to ascertain if a shooting had occurred and, if so, the nature of the men's involvement in the shooting, Officer Humphrey exited his patrol car with a weapon drawn and ordered the men to place their hands in the air. As Officer Humphrey was making this initial contact, the [Petitioner] came out of a ditch

on the driver's side of the wrecked Grand Am and placed his hands in the air. After back-up arrived, Officer Humphrey returned his weapon to the back of his vehicle, believing no shooting had occurred. The officers began working the scene as an aggravated assault traffic accident.

Officer Humphrey testified that, as he was gathering information about the traffic accident and waiting on a wrecker for the gold Grand Am, he noticed the [Petitioner] walk into the ditch on the passenger side of the Grand Am. Officer Duke, another officer at the scene, instructed the [Petitioner] to return to the roadway, and the [Petitioner] complied. Officer Duke then went into the ditch where the [Petitioner] had been, returned to the roadway, and spoke with another officer. Officer Duke then handcuffed the [Petitioner] and instructed Officer Humphrey to handcuff Robert Guerrero. The officers provided both men with Miranda warnings.

Officer Humphrey testified that both men were placed in the back of police cruisers, and their hands were covered with bags to preserve any gunshot residue that might have been present. After the [Petitioner]'s hands were bagged, but before the gunshot residue test was administered, the [Petitioner] asked Humphrey how long gunshot residue remains on one's hands after firing a weapon.

Tracy Duke, a Columbia Police Department officer, testified that he responded to a call at the National Guard Armory where he assisted in crowd control. Officer Duke explained that a fight had occurred inside but was broken up by the time he arrived, so he remained in the parking lot as people exited to ensure there were no further altercations. After Officer Duke left the Armory, he heard a police report for a shooting incident in the area of "1700 Nashville Highway." He responded, and noticed "a lot of glass in the roadway," skid marks in the road, and a gold Pontiac Grand Am in a ditch. Officer Duke saw Officer Humphrey speaking to Robert Guerrero and the [Petitioner] at the rear of the Grand Am and then noticed the [Petitioner] walk around the passenger side of the car, past the open door of the car, and into the ditch. Officer Duke asked the [Petitioner] to return to the pavement, telling him he could inspect any damage to the car after the wrecker pulled it from the ditch. The [Petitioner] returned to the road, and Officer Duke walked over to the ditch where the [Petitioner] had been looking. Standing where the [Petitioner] had been standing, Officer Duke saw within arm's reach an assault rifle lying on the ground immediately in front of him and slightly to the right. Officer Duke told Officer Ribley about the gun, and the officers handcuffed

5

Robert Guerrero and the [Petitioner].

After the two men were placed under arrest, Officer Duke assisted Officer Ribley in a safety sweep of the vehicle. The officer observed that the arm rest in the middle of the back seat was folded down, allowing access to the trunk, and a blanket was pulled halfway through this opening.

On cross-examination, Officer Duke said that, when the [Petitioner] walked around the Grand Am and appeared to be looking at something in the ditch, the [Petitioner] stood for a moment, bending over the area where the gun later was recovered.

Scott McPherson, a Columbia Police Department officer, testified he was summoned to the scene in this case because a rifle had been found. Officer McPherson observed a black rifle, installed with a loaded magazine, lying on the ground near the front right passenger side of the gold Grand Am. After collecting this rifle, Officer McPherson also collected a cigarette lighter from the shoulder of the road, a shoe from the roadway, another shoe from the ditch, and a green bandana. While at the scene, the officer collected swabs from the [Petitioner's] hand to send to a lab for gunshot residue testing.

Jeremy Haywood, a Columbia Police Department officer, testified that he received a call for back-up assistance needed at the National Guard Armory. When he arrived, a large group of people were attempting to exit the building. Officer Haywood went inside where he saw a large group of Hispanic men and a deputy who was engaged in a "verbal disagreement" with Javoris Sparkman, a co-defendant in this case. Officer Haywood said that he was acquainted with Sparkman and noticed Sparkman that night because Sparkman was the only African-American man at the Armory and because he was refusing to comply with the deputy's requests. Officer Haywood testified that the deputy was trying to quell an argument between Sparkman and the Hispanic men. After Officer Haywood saw the Hispanic men exit the Armory in compliance with the deputy's instructions, he saw Sparkman attempt to follow the men. Officer Haywood intervened and stopped Sparkman, instructing Sparkman to exit through another door, and Sparkman "stood off with [him] for a few seconds" but then eventually turned and exited through another door. Officer Haywood followed Sparkman out of the building and then returned to assist in vacating the rest of the people from the Armory.

Officer Haywood testified that, at the end of his shift, he went to the

office where, from an observation room, he observed Detective Andre Martin interview the [Petitioner], who had been taken into custody. The detective asked the [Petitioner] about Sparkman, and the [Petitioner] responded that before the fight at the Armory "they" had left with Sparkman and dropped him off at his girlfriend's house. Officer Haywood informed another officer also in the observation room that this was untrue because he had escorted Sparkman from the Armory after the fight.

Officer Haywood recalled that after the conclusion of the detective's interview of the [Petitioner], Officer Haywood saw the [Petitioner] seated in a chair. The [Petitioner] looked at Officer Haywood and asked, "You were at the Armory earlier during the fight, wasn't you?" When Officer Haywood replied that he had indeed been at the Armory, the [Petitioner] then asked, "So you know everybody that was there and you know who all . . . was at the fight and who all left?" Officer Haywood agreed and told the [Petitioner] that he knew the [Petitioner] lied to Detective Martin about Sparkman. Officer Haywood recalled that the [Petitioner] began to "tear up."

Officer Haywood privately advised a detective involved with the case, Lieutenant Jones, about his conversation with the [Petitioner] and suggested that the [Petitioner] might give a statement because he had been caught lying. In response, Lieutenant Jones and Officer Haywood interviewed the [Petitioner]. Officer Haywood described the [Petitioner] during this interview as "very emotional" and "shaking and crying." The [Petitioner] told the officers that giving a statement to the police was very difficult due to the "repercussions" he would face "on the street." Officer Haywood asked the [Petitioner] if he was affiliated with a gang, and the [Petitioner] said that both he and Robert Guerrero were members of a gang known as the "Vikings." The [Petitioner] stated, "If you roll over on a fellow folk then you pay in the streets." The [Petitioner] informed the officers that Sparkman was a member of another gang, the "Gangster Disciple[s]." When asked how the two gangs were associated, the [Petitioner] stated, "We are all folk."

Officer Haywood testified that, when the officers asked the [Petitioner] if Sparkman was in the car at the time of the shooting in this case, the [Petitioner] responded, "You already know the answer to that." They asked the [Petitioner] why the shooting occurred, and he stated, "Look, I'm going to do this for me and my cousin, but I'm only going to do this one time, so get all you need from me now. I do not want to be recorded and I do not want you to write anything down."

7

Officer Haywood recounted the story the [Petitioner] told them of the incident as follows: the [Petitioner] said that there was a fight at the Armory, and Sparkman believed the people involved in that fight left the Armory in the Expedition. The [Petitioner] described the seating arrangement in the vehicle he was in as follows: Robert Guerrero, the [Petitioner's] cousin, was in the driver's seat; Sparkman was in the front seat; and the [Petitioner] was in the driver's-side backseat. The men left the Armory traveling north on Nashville Highway when they saw the Expedition that Sparkman identified from the Armory incident. The [Petitioner] explained that Sparkman reached into the backseat, pulled the center console down to access the trunk, and retrieved the gun. The [Petitioner] said that he knew what Sparkman was about to do and that he told Sparkman "not to do it, because there was another car coming up . . . that . . . would see him." Robert Guerrero pulled up alongside the Expedition, and Sparkman began to shoot, firing multiple times. The [Petitioner] covered his face with a blanket until he felt a hard jolt and, looking out from under the blanket, saw the Expedition ram the side of their car, causing them to go across the median and into the ditch. Sparkman jumped out of the car, threw down the gun, and Sparkman and the [Petitioner] began to flee the scene. The [Petitioner] told Sparkman to go back and get the gun because it was "evidence" they should not leave behind, but Sparkman continued to run. The [Petitioner] returned to the wrecked vehicle because he did not want to leave his cousin, Robert Guerrero, to "take the rap for the shooting." When he returned to search for the gun to get "rid of it" and to talk Robert Guerrero into fleeing, he could not find the gun, and Robert Guerrero asked him to help get the car out of the ditch. After the two men tried unsuccessfully to get the car out of the ditch, police arrived. When questioned by the police, the [Petitioner] denied that a shooting had taken place and told police they had been run off the road by a red truck.

The [Petitioner] told the officers during the interview that, when a police officer found a rifle near the front passenger side of the car, he knew the officer had found the gun Sparkman used in the shooting. Several times during the interview the [Petitioner] stated that he knew "there was no way they would not get caught, because there were way too many people around and far too much evidence." He knew that police would match the rounds found in the car to the rifle found in the ditch and that they would find "the shooter's" prints on the rifle because "the shooter" was not wearing gloves when he fired the rifle at the Expedition. When asked if the gun was Sparkman's, the [Petitioner] explained that it was a "throw-down gun that everyone had access to," and that "it was in the car due to all the problems in

8

the streets." The [Petitioner] denied shooting the gun that night but said that his and Robert Guerrero's fingerprints might be found on the gun because both previously had shot the gun. The [Petitioner] denied that any other weapon was fired and maintained that only three men were in the car during the shooting. The [Petitioner] said, "[I]f the people in the Expedition were honest, innocent victims, that he did feel very sorry for what happened and to their families." He continued, "[I]f the people were affiliated with the gang world, . . . he felt no remorse for any of them because that is the life that they chose to lead." The [Petitioner] told the officers that "[H]e should not be felt sorry for, because just like them, this is the life that he chose to live. And the fact that he is involved is just a product of that life."

Andre Martin, a Columbia Police Department detective, testified that he interviewed the [Petitioner] on April 13, 2008, before the [Petitioner's] interview with Officer Haywood and Lieutenant Jones. The [Petitioner] told the detective that, after a fight had broken out during a party at the National Guard Armory, he and his cousin, Robert Guerrero, left. He said that, as they were driving down Nashville Highway, an SUV of unknown make or model ran into their car for no apparent reason. The [Petitioner] denied knowledge of a shooting and refused to discuss the incident any further. Detective Martin asked the [Petitioner] to write out his statement, and, while the [Petitioner] did so, the detective stepped into the hallway, where Lieutenant Jones instructed him to "ask [the Petitioner] about Javoris Sparkman."

Detective Martin returned to the room and, when he asked the [Petitioner] about Sparkman, the [Petitioner] replied that Sparkman had been dropped off at "his girlfriend's" before they went to the National Guard Armory. The detective had no further contact with the [Petitioner] on this day. The following day, a Maury County Sheriff's Correction Officer notified the detective that the [Petitioner] wanted to speak with him. The detective met with the [Petitioner] and took an oral statement, which he later reduced to writing. Detective Martin read the following summary of the [Petitioner]'s statement into the record at trial:

> On 4/14 [ ]on 4/14/08 I was contacted in General Sessions Court by Maury county Sheriff's Correction Officer, Berry Thompson, that [the Petitioner] wanted to speak to me about this case. He also left a message on my voice mail recording in my office the night before.

9

Later in the evening, Detective Jeremy Alsup and I spoke to [the Petitioner] at the Maury County jail, when he was reminded of his Miranda rights again, which he understood.

Alsup and I had to clarify [ ], to [the Petitioner], that it was his desire to speak to me about this case via Correction's Officer Thompson. And he replied that it was his desire to talk with Alsup and I. And there were no promises or threats made to [the Petitioner] by Alsup or I as well for the statement he was giving.

Detective Alsup wrote out [the Petitioner's] statement to us, that he did not wish to have recorded or audio taped. And [the Petitioner] did sign that statement along with the Officer and myself.

During this conversation with [the Petitioner] [ ], [the Petitioner] told Alsup and I that all four had been at a party at the National Guard Armory just after a big fight had occurred, with some of the participants in that fight being members from the Serenario's (phonetic) 13 gang or Serf 13 gang, which is said to affiliate with the MS 13 gang.

[The Petitioner] claimed gang affiliation with the Insane Vikings, or a part of the Gangster Disciples. Robert claimed [ ], this affiliation to me the day before.

[The Petitioner] went on to say that while the four, his cousin, Robert Guerrero, Javoris Sparkman, Chas, also [known as Charles Kelley] were about to leave the party. That they did not have a fight in.

And Robert was pushed by a Serf 13 member, who knew Robert to be a Viking. [The Petitioner] said that Sparkman and he then pushed the guy back and told him to chill. And [the Petitioner] stated that the Serf 13 member had on a light blue [Titans] jersey that had either the number eight or nine on it.

He then told us that Robert, Sparkman and he were escorted out of the building by a police officer. And they met up with [Kelley] in the parking lot.

10

[The Petitioner] stated that Robert felt like he was disrespected by the Serf 13. And said that Sparkman then watched the Serf 13 member get into an SUV that Sparkman thought was the same as the victim's vehicle. But it turned out not to be the same vehicle.

[The Petitioner] then said that he told Robert to take him home to the creek, which is Mill Creek, that is Mill Creek Subdivision off of Nashville Highway. [The Petitioner] stated that while driving up Nashville Highway the victim's vehicle was spotted in the right lane at Eastburg Drive and the light (inaudible) [C]oca [C]ola Plant, by Sparkman.

[The Petitioner] stated that Javoris Sparkman was then handed an SKS riffle [sic] that Robert keeps in the trunk of his girlfriend's car for protection, by [Kelley], who was sitting behind Sparkman in the rear passenger's seat. [Kelley] got the weapon from out of the trunk by pulling a rear ah, passenger hatchback or seat back back, which gave him access to the trunk.

[The Petitioner] went on to say that [Kelley] then pulled a 38 Revolver out of his pocket after handing the SKS to Sparkman. [The Petitioner] stated that Robert got caught up in the moment by driving the gold-colored four-door Pontiac Grand Am up to the victim's vehicle in the left lane.

[The Petitioner] stated he looked back and saw another vehicle behind them and told them so. [The Petitioner] stated he told them about the car behind them so they wouldn't shoot with a witness vehicle around.

[The Petitioner] then said that Sparkman and [Kelley] started shooting at the victim's vehicle about four seconds north of the Coca-Cola Plant, just after he had pulled a blanket up over his body.

And that blanket was later found in the ah, rear seat of the vehicle by Detective Cory Cooper. And turned his head while

11

sitting in the rear driver's side seat. [The Petitioner] stated that after being shot several times, the victim's vehicle then turned into the right side of Robert's girlfriend's vehicle with his front driver's side, knocking into the grass median. And left the scene out of his sight, going north on Nashville Highway.

[The Petitioner] stated that the vehicle they were in then slid across the grass. And when the front tires caught hold of the pavement in the southbound lane it scooted across both lanes and got stuck in the ditch, with the front end facing south.

[The Petitioner] stated [Sparkman] and [Kelley] exited the vehicle and ran south on Nashville Highway through a field going towards American Mobile Village. [The Petitioner] said that before Sparkman ran into the field he yelled and asked where the gun was. And [Sparkman] responded by saying he threw it into the bushes while still running.

[The Petitioner] stated that [Kelley] still had the 38 Revolver on his person. [The Petitioner] stated he ran away at first, changed his mind, and then went back to help Robert get the car unstuck, because he didn't want him to take the fall by himself.

[The Petitioner] stated that he looked for the gun and couldn't find it. And that's when the police arrived shortly after, before he could find it.

[The Petitioner] stated that if he had found the gun he would have taken off with it and we wouldn't be having this conversation.

[The Petitioner] did not originally tell Alsup and I about [Kelley's] involvement because he wanted to protect him. But after Alsup brought his name up, he felt that we knew that there were other bullets fired besides the rounds from the SKS. He said he knew 38 bullets would be found, which he knew [Kelley] had fired.

[The Petitioner] was very emotional throughout the conversation, as he cried several times about what had been

12

done and that he felt he couldn't stop it.

[The Petitioner] also shared with Detective Alsup and I that he had had a conversation from the telephone in the booking area with Charles Kelley . . . .

Upon learning of the telephone conversation between the [Petitioner] and Charles Kelley, Detective Martin said that he obtained a tape recording of the conversation, which was played for the jury. We summarize the conversation as follows: The [Petitioner] called Kelley and told him he was in jail and that police were charging him with two first degree murders. Kelley responded that he knew, "Tiff" had told him. The [Petitioner] did most of the talking during the call and twice silenced Kelley, preventing Kelley from speaking. The [Petitioner] warned Kelley multiple times that the "evidence would play out" and that "time would tell." In response, Kelley said "yeah" or "yeah, I know." Kelley also said multiple times, "the situation is critical" or "this s* * * is ugly." During the conversation the [Petitioner] referred to Sparkman as "that one," and Kelley responded by asking if the police knew about "this one." The [Petitioner] later told Detectives that Kelley was referencing himself when he said "this one." Kelley asked the [Petitioner] where they found the weapon, and the [Petitioner] explained that he tried to run but could not leave his cousin so he returned and looked for the gun to dispose of it, but did not find it. The [Petitioner] told Kelley that when police arrived, they told police that they were rammed by another car but a police officer shone a light on the gun, which was located by the right front passenger door of the car. The [Petitioner] also told Kelley that it "was all about how you tell them" referencing his discussions with police regarding the shooting incident. Kelley told the [Petitioner] that "Tiff" had told him that someone in the victim's vehicle had seen someone in the [Petitioner]'s vehicle wearing a yellow shirt.

On cross-examination, Detective Martin testified that he did not take notes during the interview, but used Detective Alsup's notes to "refresh his memory" when he wrote the summary twelve days later. Detective Martin agreed on re-cross that the [Petitioner's] statement on the 14th was similar to the statement he gave Officer Haywood the day before except that the statement from the 14th mentioned wiping gunpowder from the backseat of the car and described Kelley's involvement in the shooting.

Jeremy Alsup, a Columbia Police Department detective, testified that

13

he was the lead detective in this case and was at the shooting scene about a half-hour before proceeding to Williamson Medical Center. Detective Alsup said that, when he arrived at the hospital, two of the victims, Patricia Garcia and Juan Castro, had already died, and two other victims, Sarah Garcia and Jose Castro, had been transported to Vanderbilt Hospital for treatment. He and another detective interviewed the remaining seven victims who remained at Williamson Medical Center. Thereafter, the detective met with Dr. McMaster and learned that 38-caliber bullets had been extracted from the two deceased victims' bodies. These 38-caliber bullets were inconsistent with the [Petitioner]'s statement that only one shooter acted using an assault rifle. During the day, he was notified that the [Petitioner] wanted to make a statement, so he met with the [Petitioner] at the Maury County jail. The [Petitioner] did not want the interview audiotaped or videotaped and wanted the detective to write his statement for him.

Detective Alsup testified that, before taking the [Petitioner's] statement, he had already interviewed Charles Kelley and also had information indicating that at least two weapons were involved in the shooting. In his statement to Detective Alsup the [Petitioner] did not mention Kelley's presence during the shooting. After the [Petitioner] signed the statement written by Detective Alsup, the detective said they needed to discuss Kelley, and the [Petitioner] became "tearful," saying he had anticipated that the evidence would show that another person was present during the shooting. The [Petitioner] confirmed to police that Kelley had been present during the shooting and said that Kelley had fired at the Expedition with a .38 revolver. The [Petitioner] told the detective what to listen for on the phone conversation between the [Petitioner] and Kelley. The detective agreed that the written statement he prepared for the [Petitioner] read, in one part only, "Bro, there's a car behind us," with no mention of potential witnesses as the detectives had testified. He explained that he was limited in what he could write down but he recalled the [Petitioner] specifically saying that he told Sparkman that there were witnesses and someone might see. Detective Alsup also said, in explaining why his notes did not mention the [Petitioner's] mention of witnesses, that he knew that Detective Martin, also in the room, would be drafting a more complete summary of the interview.

On cross-examination, Detective Alsup agreed that the handgun used in this shooting had not been recovered, and that the results of the gunshot residue test indicated that the [Petitioner] did not have any gunshot residue on his hands the night of the shooting. He agreed that, at the preliminary hearing,

when defense counsel asked, "So [ ] the only thing that we really have as we sit here today is the presence of [the Petitioner] in the vehicle that night," he responded, "[T]hat is correct." The detective explained that the preliminary hearing was fifteen days after the shooting and that he spent seven of those days in job-related training in Miami. Upon further review of the evidence collected, he now believed the [Petitioner] played a role in the shooting.

Cory Cooper, a Columbia Police Department detective, testified that, on April 13, 2008, he responded to a shooting scene on Nashville Highway. Detective Cooper said that, after recovering paint chips from the debris and the gold Grand Am, he took a paint chip from the victims' Expedition and sent both sets of paint chips to the Tennessee Bureau of Investigation for analysis. He said the Expedition had body damage, two shattered windows, blood in all compartments of the vehicle, and nine gunshot holes. The detective said that, based upon his investigation, he was able to conclude that the gunshots entered the vehicle from the driver's side.

Miranda Terry, an agent with the Tennessee Bureau of Investigation ("TBI"), testified as an expert witness in the field of micro-analysis. Agent Terry said that she analyzed paint chips collected from both the victims' Expedition and the gold Grand Am and concluded that all of the paint chips submitted were from the same source indicating that these two vehicles had collided.

Mark Dunlap, a TBI forensic scientist, testified as an expert in the field of Serology and DNA. Agent Dunlap analyzed evidence submitted from this crime as well as a DNA sample from the [Petitioner]. The agent found a mixture of DNA from at least four individuals on a green bandana recovered from the scene. Upon comparison with the [Petitioner's] DNA sample, Dunlap said that he could not rule the [Petitioner] out as a contributor to the DNA profiles found on the green bandana. On cross-examination, Agent Dunlap agreed that he did not find any genetic markers from the [Petitioner] on any genetic material found on the assault rifle recovered in this case.

The previous sworn testimony of Dr. Amy McMaster, a forensic pathologist, was read into the record at trial. Dr. McMaster's testified as an expert witness in the field of forensic pathology that she performed an autopsy on Patricia Garcia. Garcia's body had a gunshot wound to her head where the bullet traveled from the back of her body to the front. Dr. McMaster said that she recovered a "medium caliber deformed bullet" from Garcia's brain and a

small fragment from a laceration near the entrance wound. Dr. McMaster testified that, based upon the gunshot wound, she estimated Garcia's death was "instantaneous or near instantaneous."

Dr. McMaster testified that she also performed an autopsy on the body of Juan Castro. Juan had three gunshot wounds to his body. Two of the wounds were located on the back of his torso, and the third wound was on the back of his right shoulder. The gunshot wound located on the right side of his torso injured his heart and lung and was fatal, and the other two wounds "did not appear to be life threatening." Dr. McMaster said that she recovered two medium caliber, deformed bullets from Juan's body.

Steve Scott, who works in the Crime Laboratory for the TBI, testified as an expert witness as to firearm identification. Agent Scott testified that he examined the magazine and the semi-automatic rifle recovered in this case. He compared bullets recovered from victim Sarah Garcia's leg to bullets shot for testing purposes from the recovered weapon and determined that the bullet retrieved from victim Sarah Garcia's leg was shot from the rifle recovered at the scene. Agent Scott examined another bullet recovered from victim Patricia Garcia's brain and a bullet fragment from her scalp and concluded that the bullet and bullet fragment were not from a semi-automatic rifle but from a revolver. Agent Scott also examined 38-caliber bullets recovered from the chest and shoulder of victim Juan Castro and determined that they were the same type and design as the bullets recovered from victim Patricia Garcia and fired from the same weapon.

At the close of the State's proof, the [Petitioner] made a motion for a judgment of acquittal which the trial court denied. The [Petitioner] then offered the following proof: Oakley McKinney, a retired forensic scientist with the TBI, testified as an expert in the field of fingerprint analysis. McKinney said that, before he retired, he received a rifle, shoes and a coke bottle for fingerprint examination and that he found no identifiable prints on the rifle.

James Davis, a TBI forensic scientist, testified as an expert in the field of forensic science. Davis testified that the result of the gunshot residue test performed on the [Petitioner] was negative.

. . . .

Based upon the evidence, the jury convicted the [Petitioner] of two

16

counts of first degree premeditated murder, two counts of first degree felony murder, and nine counts of attempted first degree murder. The trial court merged the first degree felony murder convictions with the first degree premeditated murder convictions and ordered the [Petitioner] to serve a life sentence for each of the first degree murder convictions and a fifteen-year sentence for each of the nine attempted first degree murder convictions, all sentences running concurrently, for a total effective sentence of life in prison.

*Guerrero*, 2011 WL 3107722, at *1-11. This Court affirmed the Petitioner's convictions and sentence on appeal. *Id.*

## B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief alleging that he had received the ineffective assistance of counsel. As relevant to this appeal, he contended that his trial counsel failed to request a jury instruction on the natural and probable consequences rule, failed to adequately advise him of all the considerations of not testifying in his own defense, and failed to challenge the admissibility of his statements.

At a hearing on the petition, the parties presented the following evidence: The Petitioner testified that his trial counsel ("Counsel") discussed with him the "negative side" of testifying. The Petitioner said Counsel expressed concern that the Petitioner might lose his temper while testifying. Counsel was "mostly" concerned, however, about the Petitioner inadvertently making incriminating statements during his testimony. The Petitioner said that Counsel's concerns were unfounded because any incriminating evidence was already in the record through the detectives. The Petitioner said Counsel never discussed the benefits of him testifying at trial. The Petitioner conceded that Counsel told him that it was his decision whether to testify. The Petitioner opined that, had he testified, he could have explained his statements to police.

The Petitioner testified about which of his statements to police that he would have explained to the jury had he testified. In reference to his statements about his return to the car to retrieve the gun, he said he would have explained to the jury that he was just trying to "watch over" his cousin. He said the State characterized the purpose of his return as an effort to dispose of the gun when, "in all actuality," he returned because he did not want his cousin to be at the scene by himself. The Petitioner said that he would have explained his question to police about how long gunshot residue remained on one's hands by stating that he was thinking of his co-defendant, Kelly. The Petitioner said he told Counsel that he had not shot a gun, but Counsel never discussed with him testifying to clarify this to the jury.

17

The Petitioner testified that, had he testified at trial, he would have informed the jury that this shooting was not gang-related. The Petitioner said he also wanted to explain to the jury that he was attempting to prevent the murder when he said to "them": "Don't do it. There's a car behind us." He said that, in fact, there was no car behind them, but he was hoping that "they" would get scared and let the victim drive away. He said that his testimony would have contradicted the State's assertion that he was acting as a "lookout."

The Petitioner conceded that he was the one who made the decision not to testify. He said, however, that this was based upon the advice of Counsel. He said Counsel did not threaten him and that he understood his right to testify when he waived this right. He said, however, he did not feel like he had a full understanding of the consequences of testifying, in part because Counsel never discussed with him the benefits of testifying. The Petitioner maintained that he had nothing to do with the murder. The Petitioner said he thought the outcome of his trial would have been different if the jury had heard his story.

The Petitioner contended that Counsel was ineffective for failing to file a motion to suppress his statements to police. The Petitioner said that, before he had been given his *Miranda* warnings, he made a statement to police indicating that a red truck had driven the vehicle he was in off the road. Later, after he was Mirandized, a detective interviewing him told him that he knew the Petitioner was lying about the red truck. The Petitioner said this induced him to tell the officer the truth. The Petitioner, however, was unaware that his statement about the red truck would be inadmissible at trial. He said he never would have given a verbal statement if he had known that his statement about the red truck would have been inadmissible.

The Petitioner testified that Counsel was also ineffective for failing to request the natural and probable consequences jury instruction. The Petitioner said Counsel also failed to raise this issue in his motion for a new trial.

During cross-examination, the Petitioner testified that he met with Counsel frequently to go over his case. In the week leading to the trial, he met with Counsel every day. He agreed that Counsel expressed concern that the Petitioner might lose his temper in front of the jury if he testified. Counsel was also concerned that the Petitioner would be "caught in lies in [his] different statements." Counsel also expressed concern about the Petitioner being able to explain his attempt to hide the gun. The Petitioner conceded that Counsel went through mock direct and cross-examination to prepare the Petitioner to testify if he so chose.

The Petitioner testified that his cousin, Robert Guerrero, was tried and convicted before the Petitioner's trial. Counsel brought a videotape of the trial to the Petitioner, and the two reviewed the trial. The Petitioner said he, therefore, knew the State's theory of the

case and the evidence the State intended to introduce. The Petitioner said that Robert Guerrero testified in his own defense, and he agreed that this did not go well for him. The Petitioner agreed that Robert Guerrero was also not the shooter but that he was convicted under a theory of criminal responsibility just like the Petitioner.

Counsel testified that during the course of his career he had represented criminal defendants in more than 100 jury trials. He was appointed to represent the Petitioner in general sessions court before the preliminary hearing in this case. Counsel said he met with the Petitioner for more than eight hours on the day he was appointed to the case. He found the Petitioner to be a "smart, smart person" who seemed to understand the charges he was facing and was able to ask questions if needed.

Counsel said that, during the preliminary hearing, he cross-examined the officer about the elements of criminal responsibility. Counsel said that he understood before the preliminary hearing that this was going to be a case tried under a theory of criminal responsibility, and he asked questions about this theory during the preliminary hearing. The Petitioner was present during that hearing. Counsel said that he was "sure" that he discussed the elements of the offense, including criminal responsibility, with the Petitioner.

Counsel testified that he spent over 300 hours working on this case. Some of those hours were spent reviewing Robert Guerrero's trial with the Petitioner. Counsel spent additional time attempting to negotiate a plea agreement for the Petitioner, but the State wanted the plea agreement to require the Petitioner to testify against his co-defendants. The Petitioner rejected any agreement that would require him to testify.

Counsel said that he felt like he reviewed with the Petitioner the pros and cons of the Petitioner testifying. He said that they discussed the pitfalls of his testifying. The two engaged in mock direct and cross-examination. During this, Counsel attempted to explain to the Petitioner that his responses could open the door to more evidence being admissible. He warned him not to answer a question beyond what he asked. Counsel said that "by necessity, when you're talking about the pitfalls, you're also talking about the benefits [of testifying]." Counsel recalled that there was a *Momon* hearing during which he mentioned that he and the Petitioner had gone "back-and-forth" about whether the Petitioner should testify. Counsel identified a letter he wrote to the Petitioner around the time of the trial that confirmed that the Petitioner had rejected the State's most recent plea offer. The letter also stated, "We'll continue to prepare for trial. One of the things for us to determine is if you will testify on your own behalf. I informed you that, that is your decision and your decision alone. However, I will make a strong recommendation after we determine exactly what proof the State will be introducing at trial."

Counsel testified that, in retrospect, he wished he had called the Petitioner to testify. He said, however, that if the Petitioner had testified and been convicted then he would have wished he had not called him. Counsel stated that his records reflected that he and the Petitioner met specifically to discuss whether the Petitioner should testify. Another time entry indicated that he met with the Petitioner during the trial to ensure that the Petitioner did not want to testify. Counsel remembered that at the end of that meeting he believed that the Petitioner would testify. When he returned the following morning, the Petitioner informed him that he had changed his mind and had decided not to testify.

Counsel testified that he filed several motions to suppress the statements that the Petitioner had made. His motions were focused on the Petitioner's statements about gangs. Counsel said his motions were denied, which allowed the proof regarding the Petitioner's gang affiliation. Counsel opined that this proof was "devastating." Counsel recalled another motion to suppress the Petitioner's statement at the scene about a red truck running them off the road. He agreed that this motion was granted. Counsel did not recall the State mentioning that statement in their closing argument, but he said the transcript would indicate whether that was true. Counsel recalled filing another motion to suppress the Petitioner's statement about how long gun residue stayed on the hand. The trial court denied this motion, finding that the Petitioner's statement to police was both spontaneous and voluntary.

Counsel testified that he did not recall the Petitioner ever telling him that the police told the Petitioner that they knew he was lying about the red truck. He said that, if that had happened, the Petitioner "[p]otentially" had a basis to file a motion to suppress based on the fact that the police had used some "pre-warning" statements to entice a "post-warning" statement. He said, however, that this issue was not something that he noticed while representing the Petitioner.

During cross-examination, Counsel agreed that the Petitioner was respectful, polite, and could communicate effectively. Counsel said that, during the mock cross-examinations, there were times that the Petitioner handled the questions "fairly well," and there were other times "he did not handle them well at all." Counsel said the Petitioner's responses to questions posed were unpredictable. Counsel said that the decision about whether the Petitioner should testify was not based upon his ability to be polite. Instead, this decision hinged upon some "horrendous" statements that the Petitioner made in reference to his gang affiliation. Counsel said that he had attempted to suppress those statements, but the trial judge ruled them admissible. He further explained that he felt that they had "distanced" themselves from those statements during the trial. Counsel knew that, if the Petitioner were to testify, those statements would be raised again before the jury, and Counsel did not want this done near the close of the trial.

20

Counsel testified that he was sure that he would have discussed with the Petitioner the benefits of testifying on his own behalf. He said he told all of his clients that a jury wanted to hear from the defendant. He had no specific recollection, however, of explaining to him the benefits. Counsel said he would have told the Petitioner, "Here's what I think we have to get out on direct examination," and also, "Here's what's going to hurt you [on] cross-examination." Counsel said that he believed that he went over the negatives and positives of the Petitioner testifying "much more so" than most other attorneys would have done.

Counsel testified that he was familiar with the natural and probable consequences rule as it related to criminal responsibility. He said he was unsure whether he requested the trial court give this instruction to the jury. He explained that the jury instructions he received before trial listed under the 3.01 criminal responsibility section, the natural consequences section. He said that the jury instructions that were distributed to the jury did not contain that instruction within the criminal responsibility section but in a later section under one of the lesser-included offenses. Counsel was unable to explain why the natural and probable consequences section was moved from the criminal responsibility section to another section of the jury instructions. He agreed that he would have "preferred" that instruction be given with the criminal responsibility instruction. Counsel testified that he did not realize that the instruction had been given in a later subsection until he was in the process of filing his brief on appeal. Counsel then noted that a 2009 Court of Criminal Appeals case, *Jennings v. State*, held that the natural and probable consequences rule did not apply in felony murder cases. In this case, since the Petitioner was convicted of felony murder, this instruction would not have applied.

Counsel agreed that there was a Tennessee Supreme Court case, *State v. Richmond*, that held that the natural and probable consequences rule was an essential element that the State must prove beyond a reasonable doubt when seeking a conviction based on a theory of criminal responsibility. In response to the post-conviction court's questioning, the Petitioner's attorney noted that the underlying charge in *Richmond* was aggravated robbery and not felony murder.

During redirect examination, Counsel testified that he encouraged the Petitioner to agree to the plea agreement. In one letter, he described the Petitioner's actions in not doing so as "foolish." This agreement was to serve thirty years at thirty percent for a facilitation conviction.

During recross-examination, Counsel testified that Robert Guerrero made a "horrible" witness during his trial. Counsel discussed this with the Petitioner, and they decided not to call Robert Guerrero to testify on the Petitioner's behalf. Counsel said he advised the Petitioner at the close of trial that he thought the Petitioner did not need to testify because

Counsel thought at that point that he had successfully defended the charges. He said that this was his worse defeat because he thought he had the case won.

Based upon this evidence the post-conviction court dismissed the Petitioner's petition for post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because he received the ineffective assistance of counsel at trial because his trial counsel failed to: (1) request a jury instruction on the natural and probable consequences rule; (2) adequately advise him of all of the considerations of not testifying in his own defense; and (3) challenge the admissibility of his statements.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2012). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's

22

errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.  Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936.  To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness."  *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances.  *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988).  The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 689-90.  In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Burns*, 6 S.W.3d at 462.  Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation.  *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996).  In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)).  Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).  "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation.  However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad,* 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*,

23

90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Jury Instruction

The Petitioner contends that Counsel was ineffective for failing to request a jury instruction on the natural and probable consequences rule. He states that the outcome of his trial would have been different had Counsel requested this instruction. The State counters that this instruction was given. The State asserts that the question on appeal was whether the charge was correctly given. The State goes on to assert that the Petitioner has not met his burden of providing an adequate record in this regard, because the jury instructions are not included on appeal, so the issue is waived. Even if not waived, the State asserts that the instruction was not warranted in relation to the felony murder charges, so the Petitioner cannot prove he was prejudiced.

In denying post-conviction relief on this issue, the post-conviction court found:

First of all, I'm going to go to the Natural and Probable Consequences Rule. Again, that portion of the Criminal Responsibility Stat[ute] is bracketed and it is bracketed for a reason, as other ones are.

That you look at the facts and circumstances of that particular case, what the [d]efendant has been charged with and then you make a determination as to what portion of the criminally responsibility together.

The Natural and Probable Consequences came about as a result of some robbery cases, where the [d]efendant was saying, you know, "I intended to rob, but I didn't know the guy had a gun or was going to kill somebody," and that type of thing.

Once Felony Murder came into being or maybe once the cases that described Felony Murder came into being, the Natural and Probable Consequences Rule has been found not to be applicable to Felony Murder.

And the [Petitioner] was found guilty of two counts of criminal responsibility for Felony Murder. And that, in and of itself, I think makes the point moot.

I don't think it was the proper charge to give, out of all the ways to be

24

the criminally responsible, and I didn't give it. And I think, today, looking back over the charge, the pattern, and what was charged to the jury, I think it was not the proper charge to give for Felony Murder.

And I overrule and dismiss the petition as to that ground.

The State first asserts that this issue is waived. Initially, we note that the record before us reflects that the Petitioner questioned Counsel's use of a copy of the jury instructions and that the post-conviction court reviewed the jury instructions. The Petitioner, however, has failed to include the jury instructions in the record for our review. The Petitioner carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. Tenn. R. App. P. 24(b); *see also Thompson v. State*, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). Generally, "[i]n the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Nevertheless, we will address the Petitioner's concerns.

Tennessee Code Annotated section 39-11-402(2) provides that an individual is criminally responsible for the conduct of another person if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Criminal responsibility is not a distinct crime but "a theory by which the state may prove the defendant's guilt based on another person's conduct." *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App .2007) (citing *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)). In the theory of criminal responsibility, "an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime can be inferred." *State v. Watson*, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citing *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). In this situation, "no particular act need be shown, and the defendant need not have taken a physical part in the crime to be held criminally responsible." *Id*. (citing *Ball*, 973 S.W.2d at 293)). In order to be held criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with the knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976) (quoting *Jenkins v. State*, 509 S.W.2d 240, 244-45 (Tenn. Crim. App. 1974)).

In *State v. Richmond*, 90 S.W.3d 648 (Tenn. 2002), our Supreme Court reviewed the history of the natural and probable consequences rule which we will briefly summarize as it relates to the instant case. Notably:

The natural and probable consequences rule arose as a common law component of criminal responsibility and extends criminal liability to the crime intended by a defendant, and collateral crimes committed by a co-defendant, that were the natural and probable consequences of the target crime. *See State v. Carson*, 950 S.W.2d 951 (Tenn. 1997). We have noted on several occasions that "criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999).

*Richmond*, 90 S.W.3d at 654. In the Criminal Sentencing Reform Act of 1989, the legislature codified the common law doctrine of criminal responsibility, and "the legislature clearly intended that the natural and probable consequences doctrine survive codification." *Id.* at 656 (citing *Carson*, 950 S.W.2d at 955).

*State v. Howard*, 30 S.W.3d 271 (Tenn. 2000), reiterated "that the purpose of the natural and probable consequences rule is to hold aiders and abettors 'responsible for the criminal harms they have naturally, probably and foreseeably put into motion.'" *Richmond*, 90 S.W.3d at 656 (quoting *Howard*, 30 S.W.3d at 276). The court in *Richmond* explained that *Howard* clearly "stands for the proposition that the natural and probable consequences rule is 'an essential element that the State must prove beyond a reasonable doubt' when seeking a conviction based on [a] theory of criminal responsibility." *Richmond*, 90 S.W.3d at 657. The court further observed, "More importantly, we put forth the test that courts are to apply when liability is based upon the natural and probable consequences rule." *Richmond*, 90 S.W.3d at 656. The court explained that:

[T]he State must prove beyond a reasonable doubt and the jury must find: (1) "the elements of the crime or crimes that accompanied the target crime; (2) the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and, (3) that the other crimes that were committed were the natural and probable consequences of the target crime."

*Id*. (quoting *Howard*, 30 S.W.3d at 276).

After *Howard*, this Court examined whether a trial court was required to instruct the jury on the natural and probable consequences rule in cases of felony murder. *See State v. Winters*, 137 S.W.3d 641 (Tenn. Crim. App. 2003). In *Winters*, this Court explained that "the felony murder statute . . . does not require that a homicide committed during the course of one of the enumerated felonies be foreseeable." 137 S.W.3d at 659. In other words, "'[w]hen one enters into a scheme with another to commit one of the felonies enumerated

in the felony murder statutes, and death ensues, both defendants are responsible for the death regardless of who actually committed the murder and whether the killing was specifically contemplated by the other.'" *Id.* (quoting *State v. Hinton*, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000)).

In the case presently before us, based upon *Winters*, the Petitioner clearly was not entitled to an instruction on the natural and probable consequences rule in relation to the felony murder charge. *Id.* However, the natural and probable consequences rule is applicable in cases where the State seeks a conviction for first-degree premeditated murder based upon a theory of criminal responsibility. *See Howard*, 30 S.W.3d at 273. The Petitioner in this case was convicted of premeditated first degree murder, but the trial court merged it with his felony murder convictions.

Counsel did not request the natural and probable consequences instruction because it was included in the draft of proposed jury instructions given to him. He was not ineffective for failing to request an instruction that he thought was going to be given. Regardless, the trial court was obligated to instruct the jury regarding the law applicable to the facts of the case. *See State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986). The failure to give the natural and probable consequences instruction as it related to first degree premeditated murder was error. That error, however, was harmless considering that the failure to provide that instruction "did not, beyond a reasonable doubt, affect the outcome of the trial." *Strickland,* 466 U.S. at 694 The Petitioner was not prejudiced by the failure to give that instruction in that his convictions for first degree premeditated murder merged into his convictions for first degree felony murder. Accordingly, the Petitioner is not entitled to relief.

### B. Counsel's Advice Regarding Petitioner Testifying

The Petitioner contends that Counsel failed to adequately advise him about testifying in his own defense. He asserts Counsel "insist[ed]" that he not testify, and he followed that advice. The State asserts that the proof revealed that Counsel thoroughly prepared the Petitioner for the possibility of testifying and more than sufficiently educated him about the ramifications of so doing.

About this issue, the post-conviction court found:

> Turning next to the testimony of the [Petitioner] at trial; and, you know, I think, that is one of the hardest choices an attorney has to make in a criminal case. And it's one the attorney can only give his opinion about. No one can predict the future.

27

[Counsel] testified that he thought he had the case won, and I think a win would probably have been, in my opinion, Facilitation of these offenses, the same thing that [Counsel] had the offer for.

But, if [the Petitioner] took the stand and was cross-examined for an hour about the statement he made about gangs, which I had admitted, allowed to be admitted as evidence, which was affirmed by the Court of Criminal Appeals, it could have turned into something else.

I think [Counsel] testified that he thought [the Petitioner] was the least culpable of the four defendants. And I think that statement is probably evident from the fact that he was the only one of the four defendants that received concurrent sentences.

Now, that may not be good, but, you know, it's better than what any of the other three defendants got, which were consecutive sentences on many of these counts.

That could have possibly changed, depending on how he testified. You know, I would have certainly taken that into consideration when I made the determination as to whether to run these sentences consecutive[ly] or not.

There's always a risk, if you put the client on. There's always a risk, if you don't put the client on to testify. And the attorney has to give advise based on those risks. And, then, the ultimate decision is always the [d]efendant's [decision].

We had an extensive Momon hearing in this case, as I recall, more so than most trials, because this was a First Degree Murder case.

And [the Petitioner] was fully advised that the decision was his, that no one could take the right to testify away from him, and no one could take the right not to testify away from him. That the attorney can only give advice and give his opinion, but [the Petitioner] has to make the decision.

The Court made sure that it was his decision and that he made that decision.

So I do not find [the Petitioner] has proven facts sufficient to show that

not having [the Petitioner] to testify or not advising [the Petitioner] to testify was ineffective assistance of counsel.

I can understand [Counsel's] dilemma. If he had testified and been convicted, we would be up here today saying that he shouldn't have testified. If he didn't testify and was convicted, we would be here today saying that he should have testified. And that's a dilemma, I think, that's faced in every criminal case, concerning the testimony of the [d]efendant.

. . . .

I mean, the two big statements that [the Petitioner] made that, I think, the jury probably took into consideration was the one about his involvements in gangs and if the victims were members of gangs, they got what they deserved, because this is the life they chose.

Now, that's paraphrasing, but that's the way I recall it. That was certainly a very harmful statement that he had made, and it's one that [Counsel] fought hard to keep out.

The other was the statement about, "There's no one behind the vehicle," or "there is a car be[hind] the vehicle."

You know, I think the jury assumed that [the Petitioner's] role was active in this offense, rather than just completely passive. And if [the Petitioner] had testified in that regard, it may have been worse. In that regard, it may have been better.

But [the Petitioner] has to take responsibility for the fact that, ultimately, the decision to testify is his.

We conclude the record does not preponderate against the post-conviction court's finding. *See Fields*, 40 S.W.3d at 456-57. Counsel said that he informed the Petitioner that juries liked to hear from the defendant. He prepared the Petitioner to testify, and he discussed with him the pitfalls of so doing. At the end of trial, Counsel informed the Petitioner that he did not think his testifying was necessary, considering the evidence that had come in during the trial. Counsel repeatedly informed the Petitioner that the decision to testify was his own decision. The trial court held a *Momon* hearing to ensure that the Petitioner understood his right to testify and that he was waiving his right. The Petitioner acknowledged that the decision to testify was made by him. He asserts, however, that he did

so upon the advice of Counsel, and he, in hindsight, thought it was poor advice. We conclude that the Petitioner has not proven that Counsel was ineffective in this regard. We are to avoid the "distorting effects of hindsight" in our review and view Counsel's assistance "as of the time of Counsel's conduct." *Strickland,* 466 U.S. at 689-90. Counsel was an effective attorney, who spent numerous hours with the Petitioner and rendered sound advice. The Petitioner is not entitled to relief on this issue.

## C. Admissibility of Statements

The Petitioner next contends that Counsel was ineffective for failing to challenge the admissibility of his statements. He asserts that his interrogation process was "two-step," meaning that he only gave his post-warning statements based upon law enforcement's use of his pre-warning statements. He asserts that, therefore, his post-warning statements should have been excluded, and Counsel was ineffective for not requesting as much. The State counters that the Petitioner was not subjected to a two-step interrogation process. It asserts that the Petitioner was not subject to a custodial interrogation and that he did not confess to anything when he made what the Petitioner refers to as "pre-warned" statements.

The post-conviction court found:

The issue concerning the lies told by the [Petitioner] at the scene, concerning a red truck running them off the road, which I, ultimately, suppressed that statement, I also find the [Petitioner] has failed to carry the burden on that.

The [Petitioner] was advised that he had a right to remain silent. Whether he said something before that was the truth or said something before that was a lie, he was fully aware or should have been aware that he did not have to talk to those officers. He could have simply exercised his rights under the Fifth Amendment and not talk[ed] to those officers.

Whether or not, ultimately, the lie was suppressed or not suppressed is irrelevant to that factor, in my opinion.

So I find the [Petitioner] has failed to prove the facts sufficient to justify that as grounds for post-conviction relief.

Again, the [Petitioner] made the decision, based on Miranda, to give those statements.

Counsel filed multiple motions to suppress, some of which were successful. Counsel successfully suppressed the Petitioner's statements made at the scene of the shooting. Police were attempting to discern what had happened and asked if shots had been fired. The Petitioner responded that a red truck had run them off the road. The trial court suppressed this statement. In his post-conviction petition, the Petitioner asserts that the only reason that he gave his multiple statements after he was offered *Miranda* warnings was because the police knew that he had lied about the red truck. We conclude, as did the post-conviction court, that this explanation is not plausible considering the evidence presented. The Petitioner was offered his *Miranda* warnings on multiple occasions and he waived the rights given him. The law he cites regarding "pre-warning" and "post-warning" statements is not applicable. Counsel was not ineffective in this regard, and the Petitioner cannot prove prejudice.

## II. Conclusion

After a thorough review of the record and the applicable law, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE